United States District Court
Southern District of Texas
**ENTERED**
December 13, 2022
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | |
|---|---|
| AMANDA SIERRA GUERRERO-VACO, | § |
| | § |
| Plaintiff, | § |
| | § |
| VS. | §    CIVIL ACTION NO. 2:22-CV-00022 |
| | § |
| KILOLO KIJAKAZI, *et al.*, | § |
| | § |
| Defendants. | § |

## MEMORANDUM AND RECOMMENDATION

Plaintiff Amanda Guerrero-Vaco brought this action on January 24, 2022 seeking review of the Commissioner's final decision determining she was not disabled. (Case No. 2:22-mc-15, D.E. 1). On July 19, 2022, Plaintiff filed a Brief, construed as a Motion for Summary Judgment. (D.E. 12). On September 2, 2022, Defendant filed a Brief, construed as a Cross Motion for Summary Judgment. (D.E. 13). For the reasons below, the undersigned **RECOMMENDS** Plaintiff's Motion for Summary Judgment be **DENIED**, Defendant's Motion for Summary Judgment be **GRANTED** and this case be **DISMISSED**.

## I.     JURISDICTION

The Court has jurisdiction over the subject matter and the parties pursuant to 42 U.S.C. § 405(g). This case has been referred to the undersigned pursuant to 28 U.S.C. § 636.

1 / 31

## II.   STANDARD OF REVIEW

Judicial review of the Commissioner's decision regarding a claimant's entitlement to benefits is limited to two questions: (1) whether substantial evidence supports the Commissioner's decision; and (2) whether the decision comports with relevant legal standards.  *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation omitted); *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted). The burden has been described as more than a scintilla but lower than a preponderance. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (citation omitted).  A finding of "no substantial evidence" occurs "only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988) (citations omitted).

In applying the substantial evidence standard, the Court scrutinizes the record to determine whether such evidence is present.  However, the Court does not reweigh the evidence, try the issues de novo or substitute its judgment for that of the Commissioner. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (citations omitted); *Carey*, 230 F.3d at 135 ("Conflicts in the evidence are for the Commissioner to resolve.") (citation omitted).

In evaluating a disability claim, the Commissioner follows a five-step process to determine whether (1) the claimant is presently working; (2) the claimant's ability to work is significantly limited by a physical or mental impairment; (3) the claimant's impairment

meets or equals an impairment listed in the appendix to the regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the claimant cannot presently perform relevant work. *Martinez v. Chater*, 64 F.3d 172, 173-174 (5th Cir. 1995) (citations omitted). The claimant bears the burden of proof on the first four steps with the burden shifting to the Commissioner at the fifth step who must show that, in light of claimant's Residual Functional Capacity ("RFC"), claimant can perform other substantial work in the national economy. *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

## III.    PROCEDURAL BACKGROUND

Plaintiff filed an application for benefits on March 12, 2020 at age 38, alleging disability as of November 3, 2019, due to traumatic brain injury, memory issues, depression and anxiety. (D.E. 10-3, Page 50; D.E. 10-4, Pages 2, 13, 15, 42; D.E. 10-7, Pages 2-6). Plaintiff reported her ailments began as the result of a November 3, 2019 motorcycle accident where she was a passenger without a helmet who sustained significant injuries including facial bone fractures, skull fractures and cranial hemorrhaging. (D.E. 10-10, Pages 4 and 7-8 and D.E. 10-11, Page 2). Plaintiff has a high school education and past work experience as a dispatcher and records clerk. (D.E. 10-3, Pages 50 and 64).

After Plaintiff's applications were denied initially and upon reconsideration, at Plaintiff's request, a hearing was held before an administrative law judge ("ALJ") on August 24, 2021, at which Plaintiff, who was represented by counsel, and a vocational expert ("VE") testified. (D.E. 10-3, Pages 41-69). The ALJ issued an unfavorable decision

on September 27, 2021, finding Plaintiff not disabled from November 3, 2019, the alleged

onset date, through the date of the decision.  (D.E. 10-3, Pages 9-36).

The Appeals Council declined Plaintiff's request for review on December 6, 2021,

making the ALJ's September 27, 2021 decision final.  (D.E. 10-3, Pages 2-7).  Plaintiff

then filed this action on January 24, 2022, seeking review of the Commissioner's final

decision.

## IV.    ISSUES PRESENTED

Plaintiff alleges the ALJ did not properly consider all of Plaintiff's functional

limitations resulting from her severe impairments when determining her RFC.

Specifically, Plaintiff asserts the ALJ failed to incorporate limitations related to her

reported migraines and tinnitus.  (D.E. 12, Pages 8-9).  Plaintiff further asserts the ALJ

failed to properly consider the opinions of (1) consultative psychological examiner, Dr.

Gabriel Jasso, (2) Plaintiff's treating physician, Dr. Carlos Elizondo and (3) state agency

medical consultant, Dr. John Gabriel and that by rejecting these opinions, the ALJ

impermissibly substituted "her own medical judgment to determine Plaintiff's functional

capacity."  (D.E. 12, Pages 2-3 and 9-15).

## V.    HEARING TESTIMONY AND THE ALJ'S DECISION

At the August 24, 2021 hearing, Plaintiff testified she started working again after

the November 2019 motorcycle accident in March or April 2021, first as a waitress and

later as a home provider.  (D.E. 10-3, Page 55).  She testified she was terminated from the

waitressing position because she "was told [she] was rude to customers" and from her

provider employment because the first person she "was working for said that [she] bothered his nerves" and the second person said "she had trouble finding [Plaintiff] whenever [she] was there." (D.E. 10-3, Page 55). Plaintiff stated she was terminated in July 2021. (D.E. 10-3, Page 55).

Plaintiff also testified she has anxiety and depression and she has headaches and migraines eight to ten times per month, treated with monthly injections. (D.E. 10-3, Page 57). Prior to receiving treatment, Plaintiff testified she had daily headaches. (D.E. 10-3, Pages 57-58). She also testified that when she has a headache, she takes her prescription medication, lies down and after two to three hours, "the medication kicks in." (D.E. 10-3, Page 58). Plaintiff also testified she has short term memory issues and difficulty handling stress. (D.E. 10-3, Pages 59-60 and 62).

On September 27, 2021, the ALJ determined Plaintiff had not engaged in substantial gainful activity since November 3, 2019. (D.E. 10-3, Page 14). The ALJ further determined Plaintiff had the following severe impairments:  traumatic brain injury, migraine/vascular headaches, degenerative disc disease of the lumbar spine at L5-S1, cervical radiculopathy, bilateral foot heel spurs, diabetes mellitus, tinnitus, depression, anxiety disorder and obesity. (D.E. 10-3, Pages 14-15). The ALJ also determined Plaintiff did not have an impairment or combination of impairments that met or equaled the severity of a listed impairment. (D.E. 10-3, Pages 15). In relevant part, the ALJ noted:

> While there is not a specific listing for migraines, the undersigned considered listing 11.02. The undersigned will also consider its impact when assessing the claimant's residual functional capacity. There is no evidence in the medical file or a detailed description from one of the claimant's treating

sources that establishes a migraine pattern that indicates migraines occurring at least once a week for at least three consecutive months despite adherence to prescribed treatment. There is no evidence of marked limitation in physical functioning; understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace, or adapting or managing oneself; with migraines occurring at least once every two weeks for at least three consecutive months (See SSR 19-4p) [Headache Disorders]**.**

(D.E. 10-3, Page 15).

The ALJ also determined Plaintiff's lumbar spine degenerative disc disease and cervical radiculopathy did not meet or equal the severity requirements of listing 1.15 [Musculoskeletal Disorders] because the record did not reflect she required an assistive device involving the use or both hands or that she had an inability to use one or both upper extremities. (D.E. 10-3, Page 15). The ALJ also considered the severity of Plaintiff's mental impairments, both singly and in combination, finding they did not meet or medically equal the criteria listings for depression or anxiety. (D.E. 10-3, Page 16). In making this determination, the ALJ noted Plaintiff had mild to moderate limitations related to her mental impairments. (D.E. 10-3, Pages 16-17). However, the ALJ also noted Plaintiff was able to perform simple household chores such as making her bed, doing laundry, washing dishes and vacuuming and could also prepare food, pay bills, manage funds, take medications without reminders, shop in stores, drive, play games on her cell phone, spend time with friends and family in person and on the telephone, attend church, live with others, spend time on Facebook, handle her own self-care and personal hygiene without reminders

or assistance and care for her dog.  (D.E. 10-3, Page 16-17).[1]  The ALJ further noted that

at the hearing, Plaintiff was able to describe her prior work history without difficulty,

treatment notes in January 2020 indicated Plaintiff's memory and problem solving had

improved requiring minimal assistance, the record further indicated Plaintiff was described

as alert, cooperative and comfortable and had a normal mood and affect during

appointments with Dr. Elizondo throughout 2020 and 2021, and she was able to complete

testing by Dr. Jasso on November 20, 2020 that assessed concentration and attention

although she was also noted to have some compromised concentration during the

neuropsychological examination.  (D.E. 10-3, Pages 16-17; D.E. 10-18, Pages 30-38; D.E.

10-21, Pages 89-90; D.E. 10-23, Pages 82-85; D.E. 10-29, Pages 40-56; D.E. 10-30, Pages

46-51;[2] D.E. 10-31, Pages 7-13; and 10-32, Pages 8-18).

---

[1]The ALJ cited to March 18, May 3, July 14 and September 28, 2020 function reports.  (D.E. 10-
8, Pages 2-9, 45-52, 54-61 and 72-79).

[2]Dr. Jasso noted no records were available for his review as part of the evaluation.  (D.E. 10-30,
Page 46).  He further noted that Plaintiff drove herself unaccompanied to the evaluation, she
arrived on time, was well-groomed, had no physical abnormalities, made good eye contact during
the evaluation and had no evidence of psychomotor agitation or retardation.  (D.E. 10-30, Page
46).  He further noted Plaintiff reported having daily migraines and memory issues as well as being
easily irritated, forgetful, unable to focus and having flashbacks to her time in the hospital in
addition to depression and anxiety.  (D.E. 10-20, Page 47).  He noted Plaintiff had normal speech,
relevant and logical thought processes, no evidence of serious mental illness, no PTSD symptoms,
normal eye contact, normal tactile perceptions and was oriented to time, place, person and
situation.  (D.E. 10-30, Page 48).  He further noted she had fair overall judgment and good insight
and "[h]er concentration and attention appeared to be compromised as evidenced by her difficulty
in completing basic tasks such as naming the months of the year in reverse order and counting
backwards from 20 to 1; while she completed the tasks, she did so with numerous errors and in an
abnormal time frame."  (D.E. 10-30, Page 48).  Dr. Jasso further opined Plaintiff's intellectual
functioning was "borderline in comparison to others within her age group" and her level of
academic functioning was "below average in comparison to others within her age group."  (D.E.
10-30, Page 49).  Dr. Jasso found that her overall performance during the evaluation was "in the
borderline range" and that "[i]t was reasonable to suggests that her CVA/stroke as well as the

The ALJ concluded Plaintiff had the RFC to perform a limited range of light work. (D.E. 10-3, Pages 17-20).  More specifically, the ALJ determined Plaintiff had the RFC to lift/carry 20 pounds occasionally and ten pounds frequently; could standing and walk in combination for six hours out of an eight-hour workday; could sit for a total of six hours in an eight-hour workday; could not climb ladders, ropes or scaffolds; could occasionally climb ramps, stairs, balance, stoop, kneel, crouch and crawl; could not work at unprotected heights, with hazardous materials or with moving machinery; should avoid concentrated exposure to extreme heat, cold, humidity, noise and vibration; could occasionally operate foot controls and reach overhead; could understand, remember and carry out simple, routine and repetitive instructions and make simple, work related decisions; could attend and concentrate for extended periods up to two hour intervals; could interact appropriately with the public, coworkers and supervisors; and could respond appropriately to simple, occasional changes in a routine work setting.  (D.E. 10-3, Pages 17-18).

In reaching this determination, the ALJ considered Plaintiff's November 3, 2019 accident and subsequent treatment during the next two years in detail.  (D.E. 10-3, Pages 18-22).  In relevant part, the ALJ detailed Plaintiff's treating physician Dr. Elizondo's medical opinion about Plaintiff's ability to perform physical activities.  (D.E. 10-3, Page

---

emotional distress she has experienced as a result of this experience, interfere with her occupation and social functioning…[and] impact her ability to reason and to make occupational, personal, and social judgments."  (D.E. 10-30, Page 50).  Dr. Jasso's prognosis was that Plaintiff's "cognitive deficits may potentially be long-term or permanent and as such, she will likely require ongoing assistance including psychiatric care for medication management, cognitive skills retraining, and mental health counseling."  (D.E. 10-30, Page 51).

22).[3]  The ALJ further noted that in September 2020, Plaintiff "reported chronic daily headaches with some light and sound sensitivity, intermittent spots and difficulty focusing." (D.E. 10-3, Page 23 and D.E. 10-30, Pages 60-61).  The ALJ also noted Plaintiff reported "some relief with rest and over-the-counter pain medication," that she was prescribed Topamax and Aimovig for treatment of headaches and migraines and that the dose of Topamax was increased the next month.  (D.E. 10-3, Page 23 and 10-30, Pages 59-61).

The ALJ also considered the opinion of Dr. Jasso, who performed a consultative neuropsychological evaluation on November 20, 2020.  (D.E. 10-3, Page 23).  The ALJ noted:

> Dr. Gabriel Jasso performed a neuropsychological evaluation on November 20, 2020.  The claimant reported depression, anxiety, memory loss and a traumatic brain injury.  She stated that she was unable to recall all the events that occurred in the accident.  The claimant endorsed daily migraines, memory issues, irritability, forgetfulness, difficulty focusing and frequent flashbacks of her time in the hospital.  She reported depression and increased anxiety.  The claimant drove herself to the appointment.  She was well-groomed and casually dressed.  The claimant ambulated independently and her gait was normal.  She made good eye contact during the evaluation.  There was no evidence of thought disorder.  The claimant appeared dysphoric with an appropriate affect.  She was fully oriented.  The claimant's concentration appeared to be compromised as evidenced by difficulty in completing basic tasks such as naming the months of the year in reverse order and counting backward from 20 to 1.  She completed these tasks with numerous errors and

---

[3]On August 14, 2020, Dr. Elizondo completed a medical opinion form regarding Plaintiff's "ability to do physical activities."  (D.E. 10-28, Pages 49-51).  He opined Plaintiff could walk less than one city block without rest, could continuously sit or stand for 15 minutes, could sit and stand/walk less than two hours in an eight-hour workday, would need unscheduled breaks every hour for 15 to 30 minutes, would be absent from work more than twice a month due to her impairments or treatment, must use an assistive device to walk or stand and could not lift anything about ten pounds.  (D.E. 10-28, Pages 49-50).

in an abnormal time frame. The claimant's overall judgment was fair and she appeared to have good insight.

The Wechsler Adult Intelligence Scale-IV was administered. This showed a full scale IQ of 75, placing her in the borderline range of intellectual functioning. The Wide Range Achievement Test revealed that the claimant's level of academic functioning was below average in comparison to others within her age group. The Wechsler Memory Scale-IV was also administered and showed borderline auditory memory, visual memory, visual working memory, immediate memory and delayed memory. The claimant's performance on the Trail Making Test was below average. She was diagnosed with a history of cerebrovascular accident/stroke, depression due to CVA and mild neurocognitive disorder. Dr. Jasso stated that the claimant's prognosis was guarded. He noted that her cognitive deficits might be long-term or permanent, and as such, she would likely require ongoing assistance, including psychiatric care for medication management, cognitive skills retraining and mental health counseling. Dr. Jasso stated that it was reasonable to suggest that the claimant's cerebrovascular accident as well as the emotional distress she had experienced as a result, interfered with her occupational and social functioning. He further noted that these issues impacted the claimant's ability to reason and to make occupational, personal and social judgments.

(D.E. 10-3, Page 24 and D.E. 10-30, Pages 46-51).

The ALJ further noted that on December 16, 2020, Plaintiff reported her headaches had improved with Aimovig and her two prescriptions, Aimovig and Topamax, were continued. (D.E. 10-3, Page 24 and D.E. 10-30, Page 55). The ALJ also noted that at her three month follow up neurology appointment on March 22, 2021, Plaintiff reported "her headaches were much better," her Topamax prescription was discontinued, and Plaintiff continued to use Aimovig as an injection once a month. (D.E. 10-3, Page 24 and D.E. 10-35, Pages 20-21). Just under three months later, the ALJ noted that on June 7, 2021, Plaintiff reported she stood on her feet for long periods of time while at work as a server, walking seven to eight miles per day. (D.E. 10-3, Page 24 and D.E. 10-36, Pages 14-15).

The ALJ further noted that the next week, on June 15, 2021, Plaintiff again reported to her neurologist that "she is doing better," "Aimovig is helping her," and her "[h]eadaches are under good control" with Aimovig and her prescription for a once a month Aimovig injection was continued. (D.E. 10-3, Page 25 and D.E. 10-39, Pages 33-34). The ALJ also noted that on July 19, 2021, Plaintiff reported she had elevated blood sugar for four days, intermittent hot flashes and right ear tinnitus. (D.E. 10-3, Page 25 and D.E. 10-36, Pages 6-8).

Additionally, the ALJ considered Plaintiff's testimony from the August 24, 2021 hearing, in relevant part, as follows:

> At the hearing, the claimant testified that she returned to work in March or April 2021. She stated that at first, she was working as a waitress, but was terminated because she was told she was rude to customers. The claimant testified that she then worked as a provider, but was terminated because her patient told her supervisor that she could not locate the claimant when she was at her house. She testified that since her accident, her frustration level, depression and anxiety are higher. The claimant testified that she did not have anxiety prior to the accident. She stated that she gets anxiety going to the grocery store because it is too many people. The claimant testified that when it is time for her to get her monthly injection for headaches, she starts experiencing the migraines more often. She stated that the injection does help. The claimant testified that she has eight to ten headaches per month. She stated that she contacted her physician's nurse about this, but has not had a reply. The claimant testified that prior to starting the injection, she had daily headaches. She stated that when she has a headache, she takes an oral medication she was prescribed and lays down. The claimant testified that it takes her two to three hours after the medication kicks in to recover from a migraine.
>
> The claimant testified that she has hip pain that resulted from her accident. She stated that she was going to physical therapy, which were helping to straighten out her hips. The claimant testified that she also has low back pain that was helped with physical therapy. She stated that her prescription for physical therapy ran out because her insurance would not pay for more than a certain number of days. The claimant testified that she is easily frustrated, and will last out, mostly verbally, when her anxiety and depression are both

up. She stated that when it comes to employment, she gets more flustered and aggravated from typical criticism one might get from an employer/boss. The claimant testified that prior to this such criticism was easier for her to take lightly. She stated that she did not believe that she could not perform her prior jobs due to the stress level of those jobs. The claimant testified that she was not sure why she would not be able to perform a less stressful job, but that due to COVID, these jobs are not available. She stated that her depression would keep her from communicating.

The claimant testified that during the day, she tries to find little things she can do around the house to keep herself busy. She stated that she mostly ends up staying in her room and plays games on her phone. The claimant testified that she assists her mother with household chores. She stated that she is not driving as much lately. She testified that her mother goes to the grocery store, and she will take her every once in a while. The claimant stated that she bathes and showers daily, but brushes her teeth once in a while. She testified that she will dress up some if she goes out. The claimant stated that she has only one friend who she does not see because she lives seven hours away. She testified that she will occasionally meet her sister out for dinner. The claimant stated that she sees the rest of her family daily because they live on the same property. She testified that she is able to walk one to two miles for recreation. The claimant stated that her hips and ankles are not bothering her that much. She testified that she does have two major heel spurs that start aggravating her feet when she walks. She stated that she tries to get out and exercise. The claimant testified that her short-term memory is bad, and she will not remember something she was told five minutes earlier. She stated that if she has to go to the store that is two minutes way, she has to make a list on her phone or she will not remember what she has to get.

(D.E. 10-3, Pages 25-26).

The ALJ determined Plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and the other evidence in the record for the reasons explaining in this decision." (D.E. 10-3, Page 26). The ALJ noted that after her motorcycle accident, Plaintiff participated in inpatient rehabilitation and progress notes in January 2020 show improvement in her ability to recall functional information and she

was independent with self-care tasks as well as for comprehension, express and social interaction.  (D.E. 10-3, Page 26 and D.E. 10-21, Pages 73 and 89-90).  Further, the ALJ noted that as of March 2020, Plaintiff's "functioning in the cognitive domains of attention, memory, executive function, language and visuospatial skills was within normal limits," neurology progress notes showed Plaintiff had intact sensation and strength and she was discharged from physical therapy on September 10, 2020 having "met all goals."  (D.E. 10-3, Page 27 and D.E. 10-29, Pages 72, 78-79 and 81-83).[4]

> Considering Plaintiff's reported headaches, the ALJ found as follows:
>
> The claimant also testified at the hearing that she continues to have eight to ten headaches per month in spite of medication treatment.  Progress notes from her neurologist reflect that the claimant reported improvement of her headaches with Aimovig.  As of June 15, 2021, she stated that her headaches were under good control with Aimovig.  There is no evidence that the claimant has reported   any worsening of her migraine headaches to her neurologist or any other treating provider.

(D.E. 10-3, Page 27; D.E. 10-30, Page 55;[5] D.E. 10-35, Page 20 and D.E. 10-39, Page 33).

The ALJ further noted that after the accident, Plaintiff started treatment for anxiety and

---

[4]Plaintiff was treated by a neurologist on July 22, 2020 who noted Plaintiff had filed for disability. (D.E. 10-29, Pages 78-79).  He noted Plaintiff reported her "cognitive condition [was] good" and she "denie[d] impairment in activities of daily living."  (D.E. 10-29, Pages 78-79).  Further, it was noted that Plaintiff's neurological exam was normal, her mini-mental status exam was again normal and she appeared "neurologically intact."  (D.E. 10-29, Page 79).  It was recommended that, "[a]s she is being evaluated for disability, optimal testing for cognition would be formal neuropsychological testing" with a referral by the social security office so Plaintiff would "not be responsible for testing fees."  (D.E. 10-29, Page 79).

[5]On December 16, 2020, it was noted that Plaintiff reported "to have on and off headaches but after starting on Aimovig, the patient is doing much better."  (D.E. 10-20, Page 55).  On March 22, 2021, Plaintiff "reported her headaches are much better, Aimovig is helping her.  No new complaints today."  (D.E. 10-35, Page 20).  Her prescription for Aimovig was continued and her prescription for Topamax was discontinued.  (D.E. 10-35, Page 20).  On June 15, 2021, Plaintiff

depression and Plaintiff repeatedly reported both were stable on medication and evaluations continuously show normal mood and affect.  (D.E. 10-3, Page 27; D.E. 10-29, Pages 40-42; D.E. 10-31, Pages 7-12 and D.E. 10-36, Page 9).  The ALJ then stated she had considered Plaintiff's severe physical and mental impairments in determining the RFC "as reflected by a limitation of the claimant to less than a full range of light work, with additional restrictions as set forth" in the RFC.  (D.E. 10-3, Page 27).  Finding the state agency medical consultants' opinions "partially persuasive" and "supported by their own documented review of the medical evidence available to them at the time of their review," the ALJ determined "[a]ddtional evidence at the hearing level supports a more limited range of work at the light exertional level."  (D.E. 10-3, Page 27; D.E. 10-4, Pages 14-41;[6] D.E. 10-30, Pages 55-61; D.E. 10-31, Pages 2-21 and 41-21; D.E. 10-32 to D.E. 10-39).

The ALJ also considered Dr. Elizondo's opinion and found it not to be persuasive, determining that "[w]hile his opinion is supported by his evaluations of the claimant prior to August 14, 2020, it is not consistent with his own evaluations of the claimant after that

---

again "reported she is doing better, "Aimovig is helping her," and "[h]eadaches are under good control."  (D.E. 10-39, Page 33).

[6]Upon reconsideration, Dr. Stephen Kleinman opined on December 18, 2020 that Plaintiff was able to understand, remember and carry out simple instructions, make decisions and concentrate for extended periods on only simple tasks, interact appropriately with others and adequately respond to simple changes.  (D.E. 10-4, Page 38).

Dr. John Gabriel opined on January 11, 2021 that Plaintiff had the RFC to occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand six hours, sit six hours and was unlimited in her ability to push and pull and could occasionally climb ladders and kneel with no other postural limitations.  (D.E. 10-4, Pages 31-32).  He opined Plaintiff could perform medium level work.  (D.E. 10-4, Pages 39-41).

date.  It is also not supported by the other medical evidence of record that shows that the claimant had improvement in her ability to perform the physical requirements of work activity."  (D.E. 10-3, Page 28).  Reviewing the opinion of Dr. Jasso, the consultative neuropsychological examiner, the ALJ found that "[w]hile he stated that the claimant's issues impacted her ability to reason and make occupational, personal and social judgments, he did not specifically quantify this impact in vocationally relevant limitations or terms."  (D.E. 10-3, Page 28 and D.E. 10-30, Pages 46-51).

Finding Plaintiff could not perform any of her past relevant work, the ALJ, relying on the VE's testimony, determined Plaintiff, as a younger individual with a high school education, work experience and the RFC as described above could perform work as a hand packager, mail clerk or final inspector.  (D.E. 10-3, Page 29).  Therefore, the ALJ found Plaintiff was not disabled from November 3, 2019 through the date of the decision, September 27, 2021.  (D.E. 10-3, Page 30).

## VI.   DISCUSSION

Plaintiff first asserts the ALJ erred because "the ALJ included no limitations into her RFC determination which would accommodate for the Plaintiff's migraine episodes, or her need to take medication and to lie down for several hours during such episodes, despite finding that migraine/vascular headaches significantly limit the Plaintiff's ability to perform work-related activities."  (D.E. 12, Pages 8-9).  However, while the ALJ determined Plaintiff's headaches were a severe impairment at Step Two, an individual claiming disability has the burden of proving disability and must prove the inability to

engage in any substantial gainful activity. *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983) (citation omitted). "The mere presence of some impairment is not disabling per se. Plaintiff must show that she was so functionally impaired by her [disability] that she was precluded from engaging in any substantial gainful activity." *Id*. (citations omitted); *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985) (An "impairment can be considered as not severe only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience.")

An RFC is an assessment, based on all relevant evidence, of a claimant's ability to do work on a sustained basis in an ordinary work setting despite impairments. 20 C.F.R. § 404.1545(a); *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001) ("RFC involves both exertional and non-exertional factors.") RFC refers to the most a claimant is able to do despite physical and mental limitations. 20 C.F.R. § 404.1545(a). The ALJ must consider all symptoms, including pain, and the extent to which these symptoms can be reasonably accepted as consistent with objective medical evidence and other evidence. *Wren v. Sullivan,* 925 F.2d 123, 128 (5th Cir. 1991) ("Disabling pain must be constant, unremitting, and wholly unresponsive to therapeutic treatment" and considerable deference is given to an ALJ's determination of that pain's disabling nature) (citations omitted). However, the ALJ is not required to incorporate limitations in the RFC that are not supported in the record. *Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991) ("The ALJ as factfinder has the sole responsibility for weighing the evidence…" (citation omitted). "A claimant is not

entitled to Social Security disability benefits merely upon a showing that (s)he has a severe disability.  Rather, the disability must make it so the claimant cannot work to entitle the claimant to disability benefits." *Gutierrez v. Barnhart*, No. 04-11025, 2005 WL 1994289, at *9 (5th Cir. August 19, 2005) (It was not inconsistent for the ALJ to find Plaintiff had a severe mental impairment and also find Plaintiff could perform past relevant work).

Multiple courts in the Fifth Circuit have held there must be an explanation in the ALJ's decision as to why an ALJ, having identified an impairment as severe at Step Two, did not incorporate specific limitations in the RFC based on that severe impairment.  (D.E. 12, Pages 6-7).  However, keeping in mind the differences between a Step Two severity finding and the RFC assessment, an ALJ "does not err solely because [he or] she finds an impairment 'severe' at step two but does not attribute any limitation to that impairment in assessing the claimant's RFC."  *Sarah B. v. Berryhill*, No. 1:17-cv-0080-BL, 2018 WL 3763837, at *9 (N.D. Tex. June 29, 2018), *rec. adopted*, No. 1:17-cv-080-C-BL, 2018 WL 3756944 (N.D. Tex. Aug. 8, 2018) ("Because the ALJ in this case expressly considered Claimant's severe migraine impairment when assessing her RFC, he did not err when he failed to attribute a specific limitation to that severe impairment [as] [t]he decision of the ALJ provides a sufficient explanation showing that he considered the severe impairment in making the RFC assessment notwithstanding the failure to specify a limitation directly attributable to her migraine headaches.") (citations omitted); *Stone*, 752 F.2d at 1101 (At Step Two, an "impairment can be considered as not severe only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere

with the individual's ability to work, irrespective of age, education or work experience.")
Finding impairments severe at Step Two "does not mandate additional limitations in the
RFC."  *Winston v. Berryhill*, No. 3:16-cv-419-BH, 2017 WL 1196861, at *12-14 (N.D.
Tex. Mar. 31, 2017), *aff'd*, 755 F. App'x 395 (5th Cir. 2018) (citation omitted).  "The ALJ
must clearly consider the severe impairments in determining the claimant's RFC, not
necessarily assess limitations for each severe impairment."  *Id*. at *13 (citations omitted).

Here, in making the RFC determination, the ALJ specifically discussed records from
December 2020 and March 2021 indicating medication, specifically Aimovig, controlled
Plaintiff's headaches.  (D.E. 10-3, Page 24-25 and 27; D.E 10-30, Page 55; and D.E. 10-
35, Pages 20-21).  By June 15, 2021, Plaintiff reported to her neurologist that "she is doing
better," "Aimovig is helping her," and her "[h]eadaches are under good control" with
Aimovig.  (D.E. 10-3, Page 25; D.E. 10-39, Pages 33-34); *Johnson v. Bowen*, 864 F.2d
340, 348 (5th Cir. 1988) (Impairments remedied or controlled by medication or therapy are
not disabling); *Garcia v. Astrue*, 293 F. App'x 243, 245 (5th Cir. 2008) (Claimant was not
disabled where the record showed medication controlled claimant's migraine headaches
even though the ALJ determined claimant's headaches were a severe impairment).  While
Plaintiff then testified at the August 2021 hearing that she had eight to ten headaches per
month, the ALJ, based on the objective evidence, determined Plaintiff's statements
concerning the intensity, persistence and limiting effects of her symptoms were not entirely
consistent with the medical evidence.  (D.E. 10-3, Page 26); *Chambliss v. Massanari*, 269
F.3d 520, 522 (5th Cir. 2001) (It is well settled that an ALJ's credibility findings on a

claimant's subjective complaints are entitled to deference); *Harrell v. Bowen*, 862 F.2d 471, 481 (5th Cir. 1988) (Subjective complaints must be corroborated, at least in part, by objective medical findings) (citations omitted).  Reviewing the treatment records discussed above showing Plaintiff's headaches were under "good control" with medication, the ALJ noted "[t]here is no evidence that the claimant has reported any worsening of her migraine headaches to her neurologist or any other treating provider."  (D.E. 10-3, Page 27).

Additionally, the ALJ evaluated Plaintiff's headaches under the criteria of listing 11.02 and determined the medical evidence did not support a listing-level severity.  (D.E. 10-3, Page 15).  Further, no objective medical evidence in this case indicates Plaintiff's headaches limited her ability to perform all gainful employment and the work environment, complexity and pace limitations included in the RFC can be reasonably attributed to headaches and related symptoms in addition to Plaintiff's other physical and mental impairments.  *Sarah B.*, 2018 WL 3763837, at *9-10 (There is no reversible error when the medical evidence does not support any additional limitations due to Claimant's severe migraine impairment) (citations omitted).  As noted by the ALJ, Plaintiff was able to perform simple household chores such as making her bed, doing laundry, washing dishes and vacuuming and could also prepare food, pay bills, manage funds, take medications without reminders, shop in stores, drive, play games on her cell phone, spend time with friends and family in person and on the telephone, attend church, live with others, spend time on Facebook, handle her own self-care and personal hygiene without reminders or assistance and care for her dog.  (D.E. 10-3, Pages 16-17).  She further testified she walked

one to two miles for recreation and tries to get out and exercise.  (D.E. 10-3, Page 27 and 61-62).  Plaintiff further reported that after her accident, she worked several jobs and left them because of her higher frustration level, depression and anxiety.  (D.E. 10-3, Pages 56-57).

Therefore, the undersigned recommends the ALJ sufficiently showed Plaintiff's headaches were considered when making the RFC determination regardless of whether a limitation was specifically attributed to them.  *Winston*, 2017 WL 1196861, at *12-14 (ALJ did not err in finding severe impairments at Step Two and not attributing any limitations to those impairments in the RFC assessment as the ALJ considered the impact of the severe impairments prior to making a disability finding, providing "a sufficient explanation showing that she considered the impairments in making the RFC assessment.") Here, the ALJ considered the evidence in the record related to Plaintiff's headaches, both the objective medical evidence and Plaintiff's testimony, and provided sufficient analysis as to why this severe impairment did not warrant a specific corresponding limitation in the RFC assessment.  *Id*.  The "ALJ considered the medical impairments at step two when [making] the RFC determination and assessed Plaintiff's limitations based on their impact on her actual ability to do work [and there is] no inconsistency between the ALJ's step two findings and her RFC determination."  *Id*. at *14.

Further, Plaintiff alleges the ALJ "found that the Plaintiff has tinnitus and that this condition interferes with her ability to perform work-related activities" but "did not further discuss" it or "explain how it affects the Plaintiff's ability to work, or how she

accommodated for this condition" in the RFC determination.  (D.E. 12, Page 9).  As noted

by Defendant, Plaintiff does not provide any evidence to contradict the ALJ's limitations.

(D.E. 13, Page 6).  The ALJ discussed the treatment note regarding Plaintiff's right ear

tinnitus where Plaintiff was also noted as alert, oriented, cooperative and having a normal

mood and affect.  (D.E. 10-3, Page 25 and D.E. 10-36, Pages 6-8).  The ALJ concluded

Plaintiff had the RFC to perform a limited range of light work, with Plaintiff avoiding

concentrated exposure to extreme heat, cold, humidity, noise and vibration; performing

only simple, routine and repetitive instructions; making simple, work-related decisions and

concentrating for up to two-hour intervals.  (D.E. 10-3, Pages 17-18).  As argued by

Defendant, this RFC assessment provides limitations for both headaches and tinnitus.

(D.E. 13, Page 6).  Further, Plaintiff did not testify that tinnitus limited her ability to work

or impaired her daily activities nor has Plaintiff provided any additional records or citations

to the record which indicate as such.  Therefore, the undersigned recommends Plaintiff's

first argument is without merit.

Plaintiff next asserts the ALJ failed to properly consider the opinions of (1)

consultative psychological examiner Dr. Jasso, (2) Plaintiff's treating physician Dr.

Elizondo and (3) state agency medical consultant Dr. Gabriel and by rejecting these

opinions, the ALJ impermissibly substituted "her own medical judgment to determine

Plaintiff's functional capacity."  (D.E. 12, Pages 2-3 and 9-15).  However, as discussed

below, substantial evidence supports the ALJ's RFC determination.

For all claims filed on or after March 27, 2017, ALJs are no longer required to give controlling weight to a treating physician's opinion as previously mandated. 20 C.F.R. § 404.1520c. Because Plaintiff filed her application for disability insurance benefits after this time, the new rule applies which provides the Commissioner is no longer required to defer or give any specific evidentiary weight, including controlling weight, to any medical opinion or prior administrative medical finding. *Id.* at § 404.1520c(a). Instead, the Commissioner is to consider all medical opinions and prior administrative medical findings using the factors outlined in the rule, the most important of which are supportability[7] and consistency.[8] *Id.* at § 404.1520c(b)(2). While "[t]here have never been formalistic rules governing how an ALJ must articulate his decision, [a]t a minimum, the ALJ's explanation must permit meaningful judicial review" of the supportability and consistency factors. *Walsh v. Comm'r of Soc. Sec.*, No. 4:21-cv-552-O-BP, 2022 WL 2874710, at *5 (N.D. Tex. July 7, 2022) (citations omitted).[9]

---

[7]For supportability, the regulations state "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative finding(s) will be." 20 C.F.R. § 404.1520c(1).

[8]For consistency, the regulations state: "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative findings(s) will be." 20 C.F.R. § 404.1520c(2).

[9]Whether an ALJ's analysis constitutes a sufficient explanation of supportability and consistency is "whether the ALJ's persuasiveness explanation enables the court to undertake a meaningful review of whether his finding with regard to the particular medical opinion was supported by substantial evidence, and does not requires the Court to merely speculate about the reasons behind the ALJ's persuasiveness finding or lack thereof." *Luckett v. Kijakazi*, No. 4:20-cv-4002, 2021 WL 5545233, at *3-4 (S.D. Tex. Nov. 26, 2021) (citation omitted) (Remanding case because the

However, not all statements by medical providers are considered medical opinions. Pursuant to the revised regulations, "[a] medical opinion is a statement from a medical source about what [a claimant] can still do despite [the claimant's] impairment(s) and whether [the claimant] ha[s] one or more impairment-related limitations or restrictions" in the ability to perform the physical, mental, or other demands of work or adapt to environmental conditions, including, but not limited to, sitting, standing, walking, reaching, stooping, understanding, remembering, concentrating, carrying out instructions and responding appropriately in a work setting.  20 C.F.R. § 404.1513(a)(2).  Statements from a healthcare provider that simply describe a claimant's diagnosis, clinical findings, medical history, treatment prescribed with response or make a judgment regarding their nature or severity do not fall within this definition.  *See* 20 C.F.R. § 404.1513(a)(2), (3).

The ALJ specifically considered Dr. Jasso's opinion throughout her decision, as discussed above.  (D.E. 10-3, Pages 23-24 and 28).  Dr. Jasso opined that the claimant's prognosis was guarded as "her cognitive deficits might be long-term or permanent," and

---

ALJ rejected not only the opinion of a treating physician for purposes of assessing the plaintiff's RFC but also rejected that same treating physician's underlying primary medical diagnosis that the plaintiff suffered from fibromyalgia based on an incorrect interpretation of the record).  An ALJ must articulate how supportability and consistency were considered.  *Howen v. Saul*, No. H-19-4358, 2021 WL 1169331, at *6-7 (S.D. Tex. Mar. 25, 2021) (While the ALJ stated he considered an opinion and then incorporated even more restrictive limitations into the RFC, the RFC was in fact not more limited than the suggested RFC and therefore, remand was appropriate).

However, these words need not be expressly used as the Fifth Circuit has held "[a] case will not be remanded simply because the ALJ did not use 'magic words.'"  *Ranson v. Comm'r of Soc. Sec.*, No. 4:21-cv-157-JMV, 2022 WL 2438840, at *4 (N.D. Miss. July 5, 2022) (citing *Keel v. Saul*, 986 F.3d 551, 556 (5th Cir. 2021) ("Remand is only appropriate 'where there is no indication the ALJ applied the correct standard'") (citation omitted).

she would therefore "likely require ongoing assistance, including psychiatric care for medication management, cognitive skills retraining and mental health counseling." (D.E. 10-30, Pages 46-51).  Further, Dr. Jasso opined Plaintiff's cerebrovascular accident and corresponding emotional distress had "interfered with her occupational and social functioning" and her issues "impacted the [her] ability to reason and to make occupational, personal  and social judgments." (D.E. 10-30, Pages 46-51).  Reviewing this opinion, the ALJ determined that while Dr. Jasso opined Plaintiff's "issues impacted her ability to reason and make occupational, personal and social judgments, he did not specifically quantify this impact in vocationally relevant limitations or terms." (D.E. 10-3, Page 28 and D.E. 10-30, Pages 46-51).  As correctly argued by Defendant, this is not a "medical opinion consistent with the revised regulations" as described above. (D.E. 13, Pages 7-8).  However, it is clear the ALJ at least partially credited Dr. Jasso's testing, in addition to the record as a whole, limiting Plaintiff to a restricted range of light work, taking into account her memory and concentration issues as well as restricting her to making simple decisions and having only simple, occasional changes in a routine work setting. (D.E. 10-3, Page 18).[10]

---

[10]Plaintiff stresses that additional cognitive testing was recommended by Plaintiff's treating neurologist in 2020.  The ALJ's consideration of, and weight given to, Dr. Jasso's opinion does not render the record incomplete.  Rather, the undersigned has reviewed the entire record and recommends substantial evidence supports the ALJ's determination.  Further, while recommending additional cognitive testing as Plaintiff was "being evaluated for disability," Plaintiff's neurologist noted at the same time that Plaintiff reported her "cognitive condition [was] good" and she "denie[d] impairment in activities of daily living." (D.E. 10-29, Pages 78-79).  Further, Plaintiff's neurological exam was normal, her mini-mental status exam was again normal and she appeared "neurologically intact." (D.E. 10-29, Page 79).

The undersigned next reviews the ALJ's consideration of Dr. Elizondo's opinion. As described above, Plaintiff's treating physician, Dr. Elizondo, opined in August 2020 that Plaintiff had a limited physical RFC, specifically that she could walk less than one city block without rest, could continuously sit or stand for 15 minutes, could sit and stand/walk less than two hours in an eight-hour workday, would need unscheduled breaks every hour for 15 to 30 minutes, would be absent from work more than twice a month due to her impairments or treatment, must use an assistive device to walk or stand and could not lift anything about ten pounds.  (D.E. 10-28, Pages 49-50).  The ALJ found Dr. Elizondo's opinion not to be persuasive because it was "supported by his evaluations of the claimant prior to August 14, 2020 [and] it is not consistent with his own evaluations of the claimant after that date."  (D.E. 10-3, Page 28).  Further, the ALJ stated, "[i]t is also not supported by the other medical evidence of record that shows that the claimant had improvement in her ability to perform the physical requirements of work activity."  (D.E. 10-3, Page 28).  While Plaintiff alleges she became disabled on the date of her accident, November 3, 2019, substantial evidence supports the ALJ's finding that Plaintiff is capable of performing a restricted range of light work after this date.  42 U.S.C. § 423(d)(1)(A) (Plaintiff must prove her physical or mental impairment prevents her from engaging in any substantial gainful activity for at least 12 months).  The ALJ thoroughly discussed Plaintiff's treatment records from the date of her accident in 2019 through to July 2021 which show a clear improvement of Plaintiff's physical symptoms.  (D.E. 10-3, Pages 18-28).  For example, Plaintiff's physical therapy treatment notes show Plaintiff had substantial improvement during her

therapy sessions and by September 2020, just one month after Dr. Elizondo's opinion at issue, she had "met" all goals and was discharged from physical therapy.  (D.E. 10-3, Page 23 and D.E. 10-29, Page 83).  Ambulation was noted as "[t]olerated for 1 hour," standing was noted as "[t]olerated for greater than 30 minutes," sit to stand was noted as "[m]inimal difficulty," there were no gait deviations and Plaintiff could squat to 45 degrees.  (D.E. 10-29, Pages 81-83).  It was further noted that Plaintiff "finds a steady decrease in pain with a steady improvement in function."  (D.E. 10-29, Page 81).  No mention was made of the use of any assistive device.  The ALJ also considered Dr. Elizondo's multiple treatment notes from March 2021 where Plaintiff's neck was noted as having a full range of motion and no musculoskeletal abnormalities were noted.  (D.E. 10-3, Page 24 and D.E. 10-32, Pages 8-18).  The ALJ further considered treatment notes from June 2021 where Plaintiff reported she stood on her feet for long periods of time while at work as a server, walking seven to eight miles per day.  (D.E. 10-3, Page 24 and D.E. 10-36, Pages 14-15).  The ALJ further considered Plaintiff's reported daily activities throughout the time period at issue as described above and her August 2021 testimony that she exercised and walked one to two miles for recreation.  (D.E. 10-3, Pages 16-17, 27 and 61-62).[11]   Therefore, the

---

[11]The undersigned also notes that when Plaintiff was first treated as a new patient by Dr. Elizondo on March 2, 2020, it was noted that Plaintiff had been in a motorcycle accident in November 2019, "underwent months of rehabilitation and was discharged in the care of her mother." (D.E. 10-30, Page 37).  Dr. Elizondo then noted that Plaintiff "would like to discuss referrals to specialist to clear her.  She is currently under the care of her mother, but does not feel this is necessary."  (D.E. 10-30, Page 37).  She was noted as in no acute distress and being alert, oriented and cooperative during the exam with a normal mood and affect.  (D.E. 10-30, Pages 38-39).  Further, Plaintiff denied having difficulty walking, reaching, rising from a sitting position, muscle aches, back problems, anxiety, depressed mood or headache.  (D.E. 10-30, Pages 38-39).

undersigned recommends the ALJ properly considered Dr. Elizondo's opinion and substantial evidence supports the ALJ's finding that it was not persuasive.

Additionally, the ALJ referenced the opinion of state agency medical consultant Dr. Gabriel who opined in January 2021 that Plaintiff could perform medium level work, finding his opinion to be "partially persuasive" and "supported by [his] own documented review of the medical evidence available to [him] at the time of [his] review.  Additional evidence received at the hearing level supports that the claimant is more appropriately limited to work at the light exertional level."  (D.E. 10-3, Page 28 citing to D.E. 10-30 to D.E. 10-39 and D.E. 10-4, Pages 39-41).  Therefore, based on the additional medical evidence and Plaintiff's subjective complaints, the ALJ afforded the benefit of the doubt and found her even more impaired.

While Plaintiff asserts the ALJ substituted her lay opinion for that of medical experts by discounting the opinions discussed above, the determination of residual functional capacity is solely the ALJ's responsibility.  *Taylor v. Astrue*, 706 F.3d 600, 602-03 (5th Cir. 2012) (citation omitted).  "What [Plaintiff] characterizes as the ALJ substituting [her] opinion is actually the ALJ properly interpreting the medical evidence to determine [her] capacity for work."  *Id*. at 203.  "The ALJ owes a duty to a claimant to develop the record fully and fairly to ensure that his decision is an informed decision based on sufficient facts."  *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996) (citation omitted). "Generally, however, the duty to obtain medical records is on the claimant." *Gonzalez v. Barnhart*, 51 F. App'x 484 (5th Cir. 2002) (The ALJ, who made numerous inquiries regarding Plaintiff's medical

condition and employment history and also inquired as to whether Plaintiff desired to present additional evidence, did not fail to develop the record by not ordering a consultative examination and a consultative examination was not necessary to enable the ALJ to make a disability determination).  The burden of proof lies with the Plaintiff to prove disability under the first four steps of the five-step inquiry.  *Leggett*, 67 F.3d at 564.  Further, the Fifth Circuit has held the absence of a medical source statement about a plaintiff's ability to work does not, by itself, make the record incomplete. *Ripley v. Charter,* 67 F.3d 552, 557 (5th Cir. 1995).  Instead, the issue is whether substantial evidence exists in the record to support the ALJ's decision.  *Id.*  To be substantial, such evidence must establish the effect claimant's ailments had on that claimant's ability to work.  *Id.*; *Joseph-Jack v. Barnhart*, 80 F. App'x 317, 318 (5th Cir. 2003) ("We also reject [the claimant's] argument that because the record was devoid of [an RFC] assessment by a medical source, the ALJ was not competent to assess her RFC.  It is the ALJ's responsibility to determine a claimant's RFC, and such an assessment is not a medical opinion.")

Upon review, the ALJ's determination of Plaintiff's RFC is based on substantial evidence.  The ALJ properly evaluated Plaintiff's impairments and the completeness of the record before determining Plaintiff's RFC.  All of Plaintiff's ailments and resulting limitations are discussed throughout Plaintiff's extensive treatment records.  The ALJ, who questioned the Plaintiff at length, and thoroughly reviewed her treatment records, based her determination in part on Plaintiff's own reports and testimony regarding her ability to perform certain tasks despite having claims of physical and mental limitations as well as

the medical evidence that demonstrated improvement in her conditions and control with medications.  The ALJ further noted the inconsistencies between Plaintiff's testimony and the medical and other reports obtained reflecting her abilities.

Again, it is the task of the ALJ to weigh the evidence.  *Hames*, 707 F.2d at 165; *Chambliss*, 269 F.3d at 523.  "It is not the place of this Court to reweigh the evidence, or try the issue de novo, or substitute its judgment…[i]f supported by substantial evidence, the Secretary's findings are conclusive and must be affirmed." *Id*.  Upon review, the ALJ's determination is based on substantial evidence.  The ALJ acted within her discretion in interpreting the evidence before her.  Even though the record illustrates Plaintiff suffers from several severe impairments, substantial evidence supports the ALJ's conclusion that Plaintiff's impairments did not prevent her from performing light work as identified in the RFC during the period at issue.  Ultimately, the ALJ sufficiently explained why certain opinions were unpersuasive and properly considered Plaintiff's ailments.  Plaintiff's arguments request the Court to reweigh the evidence, try the issues de novo, or substitute the Court's judgment for that of the Secretary, all of which it cannot do.  *Greenspan*, 38 F.3d at 236.  Therefore, the undersigned recommends Plaintiff's arguments are without merit.

## VII.   CONCLUSION

For the reasons above, the undersigned **RECOMMENDS** Plaintiff's Motion for Summary Judgment be **DENIED** (D.E. 12), the Commissioner's Motion for Summary Judgment be **GRANTED** (D.E. 13) and this case be **DISMISSED**.

ORDERED on December 13, 2022.

Jason B. Libby
United States Magistrate Judge

<u>NOTICE TO PARTIES</u>

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within **FOURTEEN (14) DAYS** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to 28 U.S.C. § 636(b)(1)(c); Rule 72(b) of the Federal Rules of Civil Procedure; and Article IV, General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendations in a Magistrate Judge's report and recommendation within **FOURTEEN (14) DAYS** after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.  *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415 (5th Cir. 1996) (en banc).